UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LEAH FARIA,

                Petitioner,                    **MEMORANDUM AND ORDER**
                                                  04-CV-2411 (RRM)

          - against -

ADA PEREZ, Superintendent of
Bedford Hills Correctional Facility, and
ANDREW CUOMO, Attorney General,
State of New York,

                Respondents.
------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

      On May 17, 2000, after trial in the New York State Supreme Court, Queens County, a
unanimous jury found petitioner Leah Faria ("Petitioner") guilty of second degree murder and
numerous other crimes relating to the killing of Marlin Brown. On June 7, 2000, the trial court
sentenced Petitioner to an aggregate term of 21-½ (twenty-one and one-half) years to life in prison.
On June 8, 2004, after her unsuccessful direct appeal in state court, Petitioner, proceeding *pro se*,
filed this timely petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition and
supporting papers are now before the Court, together with the State's opposition papers and
Petitioner's Traverse. For the reasons stated below, Petitioner's application for habeas relief is
DENIED, and the Petition is DISMISSED.

## BACKGROUND

      In the early morning hours of August 13, 1996, Marlin Brown ("Brown") was shot to death
in a basement beneath one of the buildings in the LeFrak City apartment complex in Corona,
Queens, New York. During the course of the subsequent investigation by the New York City Police
Department ("NYPD"), the police came to focus on Petitioner as a suspect in the homicide,

1

ultimately arresting her on July 9, 1997.  Within hours of her arrest, Petitioner confessed to the shooting.

The State charged Petitioner with numerous crimes in connection with the homicide, including second degree murder, criminal possession of a weapon, and tampering with physical evidence.

### A.     The Trial

Following hearings and jury selection, Petitioner's trial began on May 9, 2000 and ended with the jury's verdict on May 17, 2000.  The prosecution presented 14 witnesses, including seven NYPD officers and detectives with various roles in the police investigation, a forensic pathologist, and six civilian witnesses.  The defense called no witnesses.

### 1.  Marcia Jarrett, Linda Fleming, and Carl Bogle

Three of the prosecution's witnesses, Marcia Jarrett ("Jarrett"), Linda Fleming ("Fleming"), and Carl Bogle ("Bogle"), testified about some of the events that took place in the days leading up to the homicide, including interactions between Petitioner and Brown.

#### a.  *Jarrett's Testimony*

Jarrett, a Brooklyn resident and an employee of the New York City Administration for Children's Services, was Brown's girlfriend and the mother of his son.  (Transcript of the Record ("Tr.") at 1094.)  Prior to Brown's death, the two had been in a relationship for about three and a half years.  (*Id.*)  Brown and Jarrett maintained separate apartments; Jarrett lived in her own apartment in Bushwick, Brooklyn, while Brown lived with his mother and brother in LeFrak City.  (*Id.* at 109–96.)  In the months immediately prior to the homicide, while pregnant with the couple's son, Jarrett spent a great deal of time at Brown's apartment.  (*Id.* at 1098.)  During that period, the couple socialized frequently with Vanessa Faria (Petitioner's sister) and her boyfriend, Carl Bogle.

2

(*Id.* at 1098–1100.) Vanessa Faria and Bogle lived in the same building as Brown and Jarrett, and, in visiting Vanessa Faria and Bogle, Jarrett and Brown became acquainted with Petitioner. (*Id.*)

Jarrett testified that the last time she saw Brown alive was on August 10, 1996. (*Id.* at 1100.) After the two spent the day together, Brown left Jarrett and went to visit Linda Fleming,[1] his cousin. (*Id.* at 1101.) The next day, Jarrett received a call from Petitioner. Petitioner was upset and uttering the name "Poon"—a sobriquet for Cecil Evans ("Evans"), Petitioner's then-boyfriend and the father of her son. (*Id.* at 1102; *see also id.* at 795–800, 1143–44.) Petitioner asked Jarrett where she could find Brown, explaining that she "wanted to ask him about some sneakers." (*Id.* at 1102.) Although Jarrett pressed for more information, Petitioner declined to provide any. (*Id.*) Jarrett told Petitioner that Brown was at Fleming's house and gave her Fleming's phone number. (*Id.*)

The last time that Jarrett spoke to Brown was at around midnight on the night of his death. (*Id.* at 1105.) Brown called Jarrett from his sister's apartment in LeFrak City. (*Id.* at 1106.) Brown said that he had something to tell Jarrett, and that there had been "some drama," and made plans to come to her house. (*Id.*) Brown never arrived at Jarrett's apartment because he was killed later that night.

### b. *Fleming's Testimony*

Fleming, Brown's cousin, lived in Brooklyn and was in her early twenties. (*Id.* at 1115–16.) Fleming testified that she was very close to Brown and saw him nearly every day. (*Id.* at 1117.) On August 11, 1996, Brown was visiting Fleming at her apartment. (*Id.*) At around 9:00 p.m., Petitioner called Fleming's home phone and asked to speak to Brown. (*Id.* at 1117–18.) Brown took the call but became agitated and ended the phone call within a few minutes. (*Id.* at 1118,

---

[1] The transcript reflects that Jarrett referred to Brown's cousin as "Belinda," but she was apparently referring to Linda Fleming.

1122–23.)  When the phone rang a second time, Brown answered and immediately hung up.  (*Id.* at 1123.)

### c.  *Bogle's Testimony*

Carl Bogle testified that during the time period relevant to the trial, he had been living in LeFrak City with Petitioner, Donna Faria (Petitioner's mother), Vanessa Faria (Petitioner's sister), Winston Bogle (Bogle and Vanessa Faria's son), and Petitioner's son.  (*Id.* at 1129, 1137.)  Bogle testified that prior to Brown's death, the two men had a "very good friendship" and saw each other frequently.  (*Id.* at 1130.)

On August 12, 1996, Bogle returned home in the evening after spending the day with friends.  (*Id.* at 1137–38.)  Petitioner was in the apartment.  (*Id.*)  Later that evening, Brown came to the apartment.  (*Id.* at 1139.)  Brown told Bogle that he was there to talk to Petitioner concerning "[s]omething about . . . sneakers."  (*Id.*)  Brown's visit was somewhat exceptional in that he had never before come to the apartment to see anyone other than Bogle.  (*Id.* at 1142–43.)  Bogle went to bed shortly after Brown's arrival.  (*Id.* at 1145.)

## 2.  Cesar Ponce

Cesar Ponce ("Ponce") is a livery cab driver based out of Corona, Queens.  (*Id.* at 652.)  On the night of the homicide, Ponce was working a shift beginning at 6:00 p.m. on August 12, 1996 and ending at approximately 7:00 a.m. on August 13, 1996.  (*Id.* at 654.)  At around midnight, Ponce was directed to pick up a passenger at one of the LeFrak City buildings for a trip to Brooklyn.  (*Id.* at 655.)  Ponce arrived at the building and parked outside the exit door.  (*Id.* at 656.)  Ponce observed a young woman standing against the wall, looking at his car.  (*Id.*)  Ponce later identified the woman as Petitioner.  (*Id.* at 662.)  Ponce testified that Petitioner did not approach his car right away, but instead remained standing against the wall.  (*Id.* at 656.)  After five to eight

minutes, a young man entered the car through the rear door. (*Id.* at 656, 688.) At that point, Petitioner also entered the vehicle and sat next to the young man in the back seat. (*Id.*)

The male passenger told Ponce to drive to Brooklyn. (*Id* at 656.) Ponce drove eastbound on the Horace Harding Expressway and then got on the Grand Central Parkway heading south, toward Brooklyn. (*Id.*) Once Ponce entered onto the Grand Central Parkway, Petitioner told him to take the first exit, at Jewel Avenue. (*Id.* at 657.) After Ponce exited at Jewel Avenue, Petitioner instructed him to make a number of turns through local streets, ending up back at the service road from which they first exited the Grand Central Parkway. (*Id.* at 658.) Petitioner then told Ponce to back up, which he did, at which point Petitioner told him to pull over and park in the middle of the block on 112th Street. (*Id.* at 658–59.)

After parking, Ponce became nervous that his passengers might try to rob him. (*Id.* at 661.) Ponce turned around as Petitioner opened the door. (*Id.* at 659.) As Ponce was looking at her, Petitioner told him to turn off the light in the car. (*Id.*) Ponce explained that he could not turn off the light because the door was open. (*Id.* at 660.) At that point, Petitioner asked the male passenger to come with her. (*Id.* at 660–61.) After Petitioner repeated her request for what could have been two additional times, he complied, and the two left the car and proceeded toward a building complex. (*Id.* at 660–61, 673.) Ponce grew more suspicious of a possible robbery attempt and started to drive away. (*Id.* at 661) The male passenger approached the car and told Ponce to stop before he could drive away. (*Id.*) Ponce quickly remembered that the male passenger had left a bag in his car, so he stopped. (*Id.*) Both passengers then reentered the car, and the male passenger said, "forget it, let's go to Brooklyn." (*Id.*) Ponce refused. (*Id.*) The male passenger then told Ponce to take them both back to LeFrak City, and Ponce complied. (*Id.*) The entire trip lasted between 30 and 40 minutes. (*Id.* at 678.)

### 3. Arsen Babakhanov

Prosecution witness Arsen Babakhanov testified that at the time of the homicide, he lived on the first floor of the LeFrak City building where Brown was shot. (*Id.* at 1157–58.) Babakhanov's apartment was on the first floor, directly above the basement. (*Id.* at 1158.) Babakhanov testified that at approximately 1:00 a.m. on August 13, 1996, he heard two gunshots. (*Id.* at 1159.) Approximately two minutes later, Babakhanov heard three additional gunshots. (*Id.* 1159, 1164.)

### 4. Police Officer Walter Warkenthein and Detective Michael Janazzo

Two police witnesses, Police Officer Walter Warkenthein and Detective Michael Jannazzo testified about their observations at the crime scene on the night of the homicide.

#### a. *Warkenthein's Testimony*

Warkenthein, a police officer in the 110th Precinct in Queens, was on a uniformed patrol assignment on the night of the homicide. (*Id.* at 742–43.) At approximately 1:45 a.m. on August 13, 1996, Warkenthein responded to a call at the LeFrak City building located at 98-15 Horace Harding Expressway. (*Id.* at 743.) Warkenthein and his partner were the first officers on the scene. (*Id.* at 744.) The officers went directly to the basement of the building, where they discovered Brown's body. (*Id.*) Warkenthein observed that Brown had been shot several times and appeared to be dead. (*Id.*) After securing the crime scene, Warkenthein went to the Queens County Morgue where he identified Brown's body. (*Id.* at 746–47.)

#### b. *Jannazzo's Testimony*

NYPD Detective Michael Jannazzo, a member of the Crime Scene Unit, was assigned to process the crime scene in the basement where Brown was killed on August 13, 1996. (*Id.* at 585.) The trial court deemed Jannazzo an expert witness in the area of crime scene techniques. (*Id.* at 584.) Jannazzo testified that upon his arrival at the crime scene, he found Brown's body lying face

up with his head against a wall.  (*Id.* at 589–90.)  He further testified about his observations of Brown's body, including the apparent bullet wounds.  (*Id.* at 590.)  Jannazzo testified that he recovered ballistics evidence from the crime scene, including shell casings and bullet fragments, as well as evidence of bullet holes in the walls.  (*Id.* at 592–602.)  Finally, Jannazzo testified that he recovered a bag containing baby diapers and various other items on the floor next to the deceased.  (*Id.* at 618.)

### 5. Dr. Joseph Veress

Dr. Joseph Veress, a forensic pathologist, testified for the prosecution as an expert in forensic pathology.  (*Id.* at 1190.)  Veress conducted an autopsy on Brown's body on August 13, 1996.  (*Id.*)  Veress estimated the time of Brown's death to be 1:50 a.m. on August 13, 1996.  (*Id.* at 1197–98.)  Veress testified that, upon examination, he found three gunshot wounds on Brown's body.  (*Id.* at 1192.)  One bullet entered Brown's right arm just below the elbow and exited the arm above the elbow.  (*Id.* at 1192–93.)  Another bullet entered Brown's lower abdomen on the right side of his body, perforating various internal organs, bone, and muscle tissue, and exited through his right buttock.  (*Id.* at 1194.)  The third bullet entered Brown's left eye and exited through his upper back on the left side.  (*Id.* at 1195–96.)

Veress testified that he found evidence of "stippling" near the gunshot wound to Brown's eye.  (*Id.* at 1195.)  He explained that the term "stippling" refers to "small dot-like lesions which are actually bleeding in the upper epidermis," which are caused by "perforation of the skin by small bullet pellet gunpowder particles . . . ."  (*Id.* at 1197.)  Veress further explained that the presence of stippling indicates that the bullet was fired from a distance of less than 18 inches.  (*Id.*)

### 6. Detectives Hector DeFendini and William Ahern

Two NYPD detectives—Hector DeFendini ("DeFendini") and William Ahern ("Ahern")—testified about their interactions with Petitioner during the course of the police investigation.

### a. DeFendini's Testimony

DeFendini, then a detective with the Queens homicide squad, was assigned to assist with the investigation into Brown's homicide. (*Id.* at 929.) On the afternoon of August 14, 1996, the day after the homicide, DeFendini conducted an interview with Petitioner at her workplace, a Metropolitan Transit Authority facility in Queens. (*Id.* at 943–44.) DeFendini told Petitioner that he was investigating Brown's death, and Petitioner agreed to speak with him. (*Id.* at 946.) Petitioner told DeFendini that she had known Brown through her sister (Vanessa Faria) and her sister's boyfriend (Bogle). (*Id.* at 947.) Petitioner went on to explain that she had "never had any type of intimate relationship" with Brown, and that the two were "just friends." (*Id.*)

DeFendini testified that Petitioner told him that on August 10, 1996 she called Jarrett's house to ask about a pair of sneakers that Brown had either borrowed or taken from Petitioner's house. (*Id.* at 949.) Jarrett told Petitioner that Brown was not there, but rather at his cousin's house. (*Id.*) Jarrett gave Petitioner Fleming's phone number. (*Id.*) After the conversation ended, Petitioner felt that Jarrett was upset that Petitioner had called her house and asked for Brown. (*Id.*)

Petitioner further stated to DeFendini that on August 12, 1996—the day of the homicide—she returned to her apartment in LeFrak City after leaving work in the afternoon. (*Id.* at 950.) Petitioner said that she remained in her room until 9:30 p.m. that evening. (*Id.*) Upon leaving her room, Petitioner found Bogle and Brown talking in the kitchen. (*Id.*) Petitioner approached Brown and asked about sneakers he had taken. (*Id.* at 951.) In response, Brown asked whether Petitioner had been spreading rumors that she and Brown had been "getting together," and questioned Petitioner's call to Jarrett two days earlier. (*Id.*)

According to her account to DeFendini, Petitioner left the apartment at approximately 11:30 p.m. with the intention of spending the night with her son at his grandmother's house in the Bronx. (*Id.* at 953.) Brown left the apartment shortly thereafter, and together the two took the elevator down to the first floor. (*Id.*) Petitioner told DeFendini that after she and Brown exited the building, they parted ways. (*Id.* at 954.) Petitioner said that she took the subway to the Bronx, arriving at about 12:15 a.m. on August 13, 1996. (*Id.* at 954–55.)

After Petitioner completed her account of the night of the homicide, DeFendini asked Petitioner to accompany him to the police precinct so that other detectives could ask her some questions. (*Id.* at 955–56.) Petitioner agreed to do so. (*Id.* at 956.) Unbeknownst to Petitioner, Ponce was also at the precinct. (*Id.* at 960.) Detectives asked Ponce to view Petitioner through a one-way mirror (*Id*. at 959–60); however, Ponce did not then identify Petitioner as the female passenger described above. (*Id.* at 677–78, 723.) At trial, Ponce explained that he was unable to recognize Petitioner on August 14th because she was sitting at a table with her head down, crying; she was dressed differently and had a different hairdo; and the tinting on the one-way mirror through which he viewed her made it difficult to see. (*Id.* at 677–78.)

### b. *Ahern's Testimony*

Ahern, a detective with the NYPD's Cold Case Squad, also participated in the investigation of Brown's homicide. (*Id.* at 996.) On July 9, 1997, Ahern went to Petitioner's workplace and arrested her. (*Id.* at 997.) Ahern initially took Petitioner to the 105th Precinct but very quickly then took her to the 110th Precinct to conduct an interview. (*Id.* at 1000.) Ahern placed Petitioner in an interview room and, shortly thereafter, he and another detective joined Petitioner and commenced the interview by administering *Miranda* warnings. (*Id.* at 1002.)

After reading Petitioner her rights, Ahern informed her that she was under arrest with regard to Brown's death, and that police had "certain information which directed us toward her and certain individuals that directed us toward her." (*Id.* at 1005.) Petitioner asked to see the person who had implicated her in Brown's death. (*Id.* at 1006.) That person was Nikia Summerville, who was also present in the 110th Precinct at that time. (*Id.*) Ahern left the room and quickly returned with Summerville. Upon seeing Summerville, Petitioner started to cry. (*Id.* at 1006, 1008–09.) Ahern's fellow detective, Detective Hunt, told Petitioner that she might feel better if she were to talk about whatever was upsetting her. (*Id.* at 1009.) Petitioner said that she had "been depressed since this happened," that she had contemplated killing herself, and that she had "hated herself since this happened." (*Id.*) Detective Hunt again encouraged Petitioner to "talk about it." (*Id.*)

At that point, Petitioner confessed to having killed Brown. (*Id.* at 1013–16.) First, the detectives listened and asked some follow-up questions as Petitioner spoke for approximately 30 minutes. (*Id.* at 1010.) After Petitioner finished explaining the circumstances surrounding the homicide, the detectives told Petitioner that they wanted to memorialize what she had told them. (*Id.* at 1011.) The detectives prepared a written statement, which both they and Petitioner read and signed. (*Id.*) The following are excerpts from Petitioner's written confession:

> On August 12, 1996, at approximately 10 P.M. [Brown] came to my apartment. . . . [Brown] confronted me while I was in the kitchen asking me about why I was spreading words that we were messing around. [Brown] started getting loud about the fact that he had been told that I had said we were messing around. Because [Brown] got loud my sister came out of her room and came into the kitchen. My sister said something about the argument and then my mother came into the kitchen. My mother looked to see who I was arguing with and she left the kitchen.
>
> A short time later we left the apartment. Prior to leaving I went into my room, got a gun from under my mattress and placed it inside the waistband of my pants. I left the apartment and went to the elevator where I was joined by [Brown]. We went onto the elevator and went

downstairs. While we were riding on the elevator [Brown] told me he wanted me to come with him to Brooklyn so I could tell his girlfriend that there was nothing going on between [Brown] and her [*sic*]. I walked with [Brown] to his sister's house so we could get his sister's car. I waited downstairs for a while. When [Brown] returned [he] stated he could not get the car, but he had called a cab.

Couple of minutes later a cab arrived and we got in the [cab]. [Brown] told the cab driver we wanted to go to Bushwick. While in route to . . . Brooklyn, I changed my mind. I did not want to go. I wanted to go back to Lefrak.

The cab stopped on the street and I got out. [Brown] and I were still arguing and [Brown] got out of the cab. When [Brown] got out of the cab the cab drove off and [Brown] yelled to the driver because his bag was still in the cab. The driver stopped and we got back into the cab. We told the driver to drive and he said where to? The driver told us he was not going anywhere, he was taking us back to where he had picked us up. The cab driver [took] us back to 98-15 Horace Harding Expressway and left us out on Horace Harding. We walked to the side entrance and I think it was opened, so we went in. We walked into the basement and we were still arguing about the [rumors concerning Brown and Petitioner].

When we got to the top of the ramp [Brown] shoved me twice and told me, Fuck that, I'm going to let Wifey – I'm going to tell Wifey handle you [*sic*]. I asked [Brown] what do you mean by that and [Brown] said she is going to do whatever.

[Brown] started walking to the elevator and I followed behind him. [Brown] then waved his hands at me and said fuck you. I then pulled out my gun and [Brown] turned and saw me holding the gun. [Brown] then said I'm going to get you, bitch, and he started toward me. [Brown] grabbed my right hand, which I had the gun in and he was grabbing me with his right hand. I then fired the first shot, which struck the wall and we continued wrestling. [Brown] then grabbed me by the hair, trying to force me down to the floor. I fired the second shot while we were wrestling and then fired a third shot. After the third shot [Brown] fell to the floor by the door leading to the stairs. I then started to walk out. When I got to the exit door I realized my hair clip was missing. I went back and picked up my hair clip, which was on the floor next to [Brown]'s right side. When I went back I saw that [Brown] was still lying on the floor, but I did not see much blood.

I then left the building and . . . took the train to the Bronx. I . . . took a shower, changed my clothes and went to work.

> While at work that day the police came and brought me to the precinct. After speaking to the police they drove me to the train and I went home. When I went home I spoke with [Summerville], who was a friend of my boyfriend's family. I told [Summerville] I had shot the boy, what am I going to do? I kept asking him what am I going to do?
>
> I decided to get rid of the gun so I got into the cab and . . . and went to 96 Street and First Avenue in Manhattan. I got out of the cab and I had the gun wrapped up in a bag inside my waistband. I walked over to the water and threw the gun, which was still in the bag, into the water.

(*Id.* at 1013–17.)

After completing her written statement, Petitioner provided an additional, audio-taped statement in the presence of Ahern and an assistant district attorney. (*Id.* at 1021.) That tape was played for the jury subsequent to Ahern's reading of Petitioner's written statement. (*Id.*)

### 7. Nikia Summerville[2]

Summerville testified that he became acquainted with Petitioner through his friendship with Evans ("Poon"), Petitioner's incarcerated boyfriend and father of her son. (*Id.* at 795–96.) Summerville further testified that, during the months prior to the shooting, he had participated in several three-way telephone conversations with Petitioner and Evans. (*Id.* at 799.) Summerville stated that Petitioner had been holding a gold and diamond necklace for Evans while he was in jail. (*Id.* at 813.) When Petitioner told Evans that at some point his necklace had gone missing, Evans directed her to find out who had stolen the chain and to resolve the matter; if she failed to do so, Evans would physically harm her. (*Id.* at 813–14.) According to Summerville, Petitioner knew that the necklace was now in Brown's possession and that Evan's directive meant that Petitioner was to resolve the matter by hurting or killing Brown. (*Id.* at 816.) Summerville further testified that Petitioner called him shortly after the shooting and excitedly confessed to killing Brown at Evan's

---

[2] As detailed *infra*, Summerville's testimony was stricken in its entirety.

behest. (*Id.* at 802–03). Specifically, Summerville testified that Petitioner stated to him that she fired an initial shot at Brown as he entered the basement ahead of her; then fired a second shot as she and Brown struggled. (*Id.* at 805.) According to Summerville, Petitioner explained to him that the second gunshot caused Brown to fall to the ground, after which Petitioner shot Brown in the head. (*Id.*)

## B. The Jury's Verdict

Following the presentation of evidence, closing arguments, jury instructions, and deliberations, the jury returned its verdict and found Petitioner guilty of depraved-indifference murder, criminal possession of a weapon, and tampering with physical evidence. The jury, however, acquitted Petitioner of intentional murder.

## C. Sentencing

On June 7, 2000, Petitioner was sentenced to concurrent indeterminate prison terms of twenty years to life on the murder charge; six to twelve years on the second-degree weapon charge; and three to six years on the third-degree weapon charge. In addition, Petitioner was sentenced to two terms of one to three years on the evidence tampering charges, to run concurrently with each other but consecutively to the terms on the first three charges.

## D. Subsequent Proceedings

In November 2002, Petitioner, through counsel, timely appealed her conviction to the New York State Supreme Court, Appellate Division, Second Department. In her brief, she raised the same four claims brought in the instant petition. On April 28, 2003, the Appellate Division affirmed Petitioner's conviction. *People v. Faria*, 757 N.Y.S.2d 878 (App. Div. 2003). Petitioner then timely sought leave to appeal to the New York State Court of Appeals. On July 14, 2003, the

Court denied Petitioner's application. *People v. Faria*, 100 N.Y.2d 580 (2003). The instant petition for a federal writ of habeas corpus followed.[3]

## STANDARD OF REVIEW

In deciding whether to grant a federal habeas corpus petition, the Court must apply the standard of review set forth by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The AEDPA requires a rigorous standard of review with regard to petitions filed by state prisoners. *See Williams v. Taylor*, 529 U.S. 362, 402–03 (2000). Under the AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Though the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are analyzed independently, both limit the source of clearly established law to the Supreme Court's jurisprudence. *Williams*, 529 U.S. at 404–05, 412; *see also Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (quoting *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002)).

A state court "adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261

---

[3] This matter was initially assigned to the Honorable Raymond J. Dearie. On April 23, 2007, Petitioner sought leave to amend her petition to add additional arguments, or, in the alternative, for a stay of these proceedings to allow her to exhaust the contemplated additional arguments in state court. (Doc. Nos. 7, 8.) Thereafter, on December 18, 2007, the case was reassigned to this Court and Petitioner was directed to supplement her request to amend. (*See* Order dated February 6, 2008 (Doc. No. 10).) However, by letter dated March 5, 2008, Petitioner withdrew her application. (*See* Doc. Nos. 12, 13.)

F.3d 303, 312 (2d Cir. 2001) (citation and internal quotation marks omitted). "When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Id.* This is because "federal courts recognize a conclusive presumption that, when presented with an express federal claim, a state court's decision rests principally upon an application of federal law even absent any express reference to federal authority." *Reznikov v. David*, No. 05-CV-1006, 2009 WL 424742, at *3 (E.D.N.Y. 2009) (citing *Sellan*, 261 F.3d at 314).

The Supreme Court has noted that a state court decision will be "contrary to" established Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if a state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 405–06.

Further, the Supreme Court has held that, with respect to the "unreasonable application" clause, a federal court may grant a petitioner's writ of habeas corpus "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. The state court's application, however, must be "objectively unreasonable," *id.* at 409–10, a "higher threshold" than "incorrect." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).[4] Moreover, if a federal court "finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must

---

[4] According to the Second Circuit, however, though "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000) (citations and internal quotation marks omitted).

next consider whether such error was harmless." *Howard*, 406 F.3d at 122 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 629–30 (1993)).

## DISCUSSION

### A. *Rosario/Brady* Claim

Petitioner first argues that the delayed disclosure of a taped interview of Summerville by the police substantially prejudiced her at trial. This claim, however, must fail. It is well settled under State law that the prosecution must disclose to the defense any statement of a witness whom it intends to call at trial that is in the prosecution's possession or control and relates to the subject matter of the witness's testimony. *See People v. Rosario*, 9 N.Y.2d 286, 290–91 (1961). However, purported *Rosario* violations are premised solely upon New York State law and, therefore, do not present a federal constitutional question cognizable under federal habeas corpus doctrine. *See Landy v. Costello*, 141 F.3d 1151, 1151 (2d Cir. 1998); *see also Pena v. Fischer*, No. 00 Civ. 5984, 2003 WL 1990331, at *10 (S.D.N.Y. Aug. 30, 2003) (collecting cases).

To the extent that Petitioner asserts that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), this claim must also be rejected. In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

To establish a *Brady* violation, a habeas petitioner must show that: 1) the evidence at issue was favorable to the accused either because it was exculpatory or could have impeached a prosecution witness; 2) the evidence was suppressed by the prosecution either willfully or inadvertently; and 3) prejudice ensued from the withholding of the evidence at issue. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Accordingly, "[t]he suppression of exculpatory [evidence]

16

does not cause a constitutional violation unless the [evidence is] material, *i.e.*, 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Here, Petitioner's failure to establish a reasonable probability that the prosecution's dilatory disclosure of the audiotape at issue would have resulted in a different outcome at trial is fatal to her purported *Brady* claim.

First, Petitioner does not argue that the audiotape of the Summerville interview contained any exculpatory material. Next, Petitioner has failed to show that the delayed disclosure of the audiotape at trial compromised her ability to impeach Summerville's testimony. Indeed, after being afforded a copy of the audiotape at issue, Petitioner strategically and expressly declined the trial court's offer to have Summerville recalled to the witness stand for the purpose of re-cross-examining his direct testimony in light of his previously recorded statements contained on the audiotape. (*See* Tr. at 1231.) Moreover, despite Petitioner's decision to forgo re-cross-examination of Summerville, the trial court nevertheless *sua sponte* struck Summerville's *entire* testimony as — in the trial court's own words — a "drastic" sanction for the prosecution's untimely disclosure. (*Id.* at 1231–32, 1460.)

Petitioner contends, however, that striking Summerville's testimony was inadequate because the jury was unable to ignore it, despite the trial court's explicit instruction to do so. This argument is unavailing, as "juries are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (internal quotation marks and citation omitted); *United States v. Colombo*, 909 F.2d 711, 715 (2d Cir. 1990). In this case, the court strongly instructed the jury to disregard the stricken testimony as follows:

> [F]or legal reasons the testimony of Nikia Summerville is stricken in
> its entirety. That is his direct, his cross and any redirect, and re-cross,

> stricken. It's out of the record. It's out of this case. Therefore, you
> are not to consider his testimony in any way, shape or form. Please do
> not speculate about that. Now, I know that it's easier said than done to
> say strike from your mind thus and such, but that is your duty as
> jurors, and that is that you may not consider his testimony. It may not
> properly be brought up in the course of the deliberations. It is as
> though it hasn't been said in this courtroom. So, please remember
> that, it is stricken. It is out of the record.

Tr. at 1234.

Moreover, the conclusion that the jury heeded the above instruction is bolstered by the verdict. Specifically, as noted *supra*, Summerville's testimony alone established Petitioner's motive for intentionally killing Brown; that is, Petitioner was obeying Evan's directive to kill Brown in retaliation for purloining the necklace that Petitioner had been charged with safekeeping. Indeed, Summerville's testimony detailed the conversations among Petitioner, Summerville, and Evans outlining the desire to kill Brown, as well as Petitioner's admission to Summerville shortly after the shooting that she had carried out Evan's directive. Had the jury considered this testimony, it would have supported a theory that Brown was intentionally killed. However, as explained *supra*, the jury acquitted Petitioner of intentional murder, convicting her instead of depraved indifference murder.

For the foregoing reasons, neither the trial court's decision to strike Summerville's testimony and instruct the jury as described above, nor the Appellate Division's rejection of this aspect of Petitioner's appeal, was an unreasonable application of, or contrary to, the Supreme Court's holding in *Brady* and its progeny. As such, Petitioner may not be granted habeas relief with regard to this aspect of her petition.

## B. Alleged Sleeping Juror

Petitioner next argues that the trial court's failure to dismiss a juror that had been suspected of sleeping at some points during the presentation evidence deprived her of her Constitutional right to a jury trial. The Court also rejects this contention. Despite a report immediately prior to summations that a juror appeared to be asleep during portions of the trial, neither the trial court, the prosecutor, nor defense counsel observed such conduct. (Tr. at 1313.) Moreover, the record is clear that, after consulting with her attorney, Petitioner herself objected to the proposed remedy of replacing the juror in question with an alternate juror. (*Id.* at 1314–15.) Indeed, immediately after the matter was brought to its attention and before proceeding to summations, the trial court elicited Petitioner's personal, express consent to the juror in question being retained. (*Id.*)

As a threshold matter, to the extent that Petitioner relies on N.Y. Crim. Pro. Law § 270.35 for the proposition that the trial court lacked the discretion Petitioner asked it to invoke, and was instead *required* to remove the alleged sleeping juror despite her expressly stated desire to have that juror remain empanelled on the jury, Respondents correctly note that Petitioner raises an issue purely of state law. *See Hameed v. Jones*, 750 F.2d 154, 160 (2d Cir. 1984). As such, this claim does not present a federal question cognizable under habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Nevertheless, even if Petitioner's claim were reviewable in this forum, it still fails. This is so because habeas relief is available for juror misconduct only where a petitioner can demonstrate that she has suffered prejudice as a result. *See Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (citing *Irvin v. Dowd*, 366 U.S. 717, 724 (1961)). Petitioner has failed to make such a showing here. Of course, the trial court is in the best position to assess alleged juror misconduct. *See*

*Wainwright v. Witt*, 469 U.S. 412, 424–26 (1985); *United States v. Parker*, 903 F.2d 91, 101 (2d Cir. 1990). Moreover, a trial judge has "wide discretion to decide upon the appropriate course to take, in view of his personal observations of the jurors and parties." *United States v. Aiello*, 771 F.2d 621, 629 (2d Cir. 1985); *see also Jones v. Donnelly*, 487 F. Supp. 2d 403, 414 (S.D.N.Y. 2007) ("The trial court's treatment of juror misconduct . . . are reviewed for abuse of discretion only, and only if juror misconduct and actual prejudice are found.") (internal quotation marks omitted).

Here, the trial court stated that it did not observe the juror in question sleeping during the trial; indeed, it confirmed with both the prosecutor and defense counsel that they also did not notice that the juror in question was asleep at any point during the trial. (Tr. at 1313.) When the juror in question was directly asked if anything would affect her ability to deliberate, she answered in the negative. (*Id.* at 1279–80.) Significantly, Petitioner herself made a knowing, strategic decision to request that the court retain the juror in question and have her engage in deliberations. (*Id.* at 1314–15.) As the Second Circuit has observed, decisions such as these are among the "objectively reasonable strategic choices" litigants often face at trial. *See Guinyard v. Keane*, 56 Fed. App'x 44, 46 (2d Cir. 2003) (noting that by failing to object to a sleeping juror, the defense may have favored the distracted juror; considered an objection fruitless in light of trial court's broad discretion to remedy such problems; or sought to avoid the risk of annoying the jury as a whole). Notably, Petitioner does not contend that any alleged juror misconduct adversely affected the jury's deliberations or had a substantial and injurious effect on its ultimate conclusions. In sum, the Court concludes that Petitioner has not demonstrated that there was actual juror misconduct at trial, or that she was prejudiced by the trial court's acquiescence to her express request that the juror in question remain empanelled. Accordingly, Petitioner is not entitled to habeas relief on this claim.

## C. Sufficiency of the Evidence

Petitioner argues next that the evidence at trial was insufficient to convict her of depraved indifference murder, as opposed to manslaughter in the second degree.[5]  A habeas petitioner who challenges the sufficiency of the evidence supporting her conviction "bears a heavy burden." *United States v. Griffith*, 284 F.3d 338, 348 (2d Cir. 2002).  Indeed, to obtain habeas corpus relief based on insufficiency of the evidence, the Court must find that, when viewing the evidence most favorably to the prosecution, no rational trier of fact could find guilt beyond a reasonable doubt. *Farrington v. Senkowski*, 214 F.3d 237, 240–41 (2d Cir. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).  The Court must defer to the jury's determination of the weight given to conflicting evidence, witness credibility, and inferences drawn from the evidence.  *United States v. Vasquez*, 267 F.3d 79, 90–91 (2d Cir. 2001) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)).  This "inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original).  In addition, the Court must "credit every inference that could have been drawn in the state's favor . . . whether the evidence being reviewed is direct or circumstantial."  *Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir. 1988).

In this case, a review of the record in the light most favorable to the prosecution readily establishes that a reasonable juror could have found that Petitioner acted with a depraved

---

[5]  At the time Petitioner's conviction became final in October 2003, the *mens rea* required to sustain a conviction for depraved-indifference murder was recklessness.  *See People v. Sanchez*, 98 N.Y.2d 373 (2002) overruled by *People v. Feingold*, 7 N.Y.3d 288, 294 (2006).  In *Feingold*, the New York Court of Appeals clarified that "depraved indifference to human life" is itself the appropriate culpable mental state.  *See Feingold*, 7 N.Y.3d at 296.  However, *Feingold* does not apply retroactively and may not be used as a basis for granting the instant petition.  *See Policano v. Herbert*, 7 N.Y.3d 588, 601–03 (2006); *see also Rustici v. Philips*, 497 F. Supp. 2d 452, 486 (E.D.N.Y. 2007), *aff'd*, 308 Fed. App'x 467 (2d Cir. 2009); *see also Bertolini v. Smith*, No. 05 CV 2620, 2007 WL 2769263, at *8 (E.D.N.Y. Sept. 8, 2007) (collecting cases).  In any event, the record in this case plainly supports the conclusion that the evidence at trial could have led a rational fact-finder to find that Petitioner acted with depraved indifference to Brown's life.  As such, for these reasons, and for those discussed in the main text, the Court concludes that the Appellate Division's decision affirming Petitioner's conviction was not an unreasonable application of, or contrary to, Supreme Court precedent.  28 U.S.C. § 2254(d).

indifference to Brown's life.  There was substantial evidence that in the days leading up to the

homicide, Petitioner was actively inquiring as to Brown's whereabouts.  (*See, e.g.*, Tr. at 1102,

1118.)  Next, Petitioner, anticipating her encounter with Brown, retrieved the murder weapon from

her room.  (*Id.* at 1014.)  Moreover, a reasonable juror could have concluded that the forensic

evidence established that Petitioner fired the final, fatal gunshot from almost point-blank range at

Brown's face after he had likely been knocked off his feet by one of the first two gunshots.  (*Id.* at

1199.)[6]  By her own admission, Petitioner left Brown lying in the basement, bleeding from three

gunshot wounds, without attempting to render aid and without knowing whether he was alive or

dead—despite returning to the scene to retrieve her missing hair clip.  (*Id.* at 1014.)  In sum,

drawing all reasonable inferences from the facts in the light most favorable to Respondents, a

rational juror could have rejected Petitioner's contentions that she acted either defensively or

recklessly and could have instead reasonably concluded that Petitioner killed the unarmed Brown

under circumstances evincing a depraved indifference to human life.  As such, Petitioner has not

shown that the Appellate Division's decision affirming her conviction was either an unreasonable

application of, or contrary to, the standards espoused by the Supreme Court in *Jackson* and its

progeny.[7]

### D.  Excessive Sentence

Finally, Petitioner asserts that the sentence imposed by the trial court was excessive because

the underlying conviction was Petitioner's first offense, and, prior to the criminal conduct at issue

here, she had been an otherwise law-abiding citizen.  These arguments, however, cannot provide the

---

[6] Expert Veress testified that shot number two would have been likely to knock someone down, although "[it] is also likely that it could not have." (*Id.* at 1204.)

[7]  Although it is not apparent from her petition, to the extent that Petitioner also argues, as she did on her direct appeal, that her conviction for depraved indifference murder was against the weight of the credible evidence, this argument also fails.  A challenge to the weight of the evidence, as opposed to its sufficiency, is not cognizable on habeas review.  *See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996).

basis for habeas corpus relief because Petitioner does not present any question of federal constitutional law as the sentence imposed by the trial court fell squarely within the statutory limits set forth under New York State law.  *See Dorsey v. Irvin*, 56 F.3d 425, 427 (2d Cir. 1995) (citing *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)).  Accordingly, Petitioner's contentions with respect to the sentence imposed by the trial court are rejected.

## CONCLUSION

For the forgoing reasons, it is hereby ORDERED that the instant habeas corpus petition is DENIED in its entirety.

The Clerk of Court is directed to dismiss the petition, send a copy of this Memorandum and Order to petitioner, and close the case

Because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue.  *See Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 112–13 (2d Cir. 2000).  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith.  *Coppedge v. United States*, 369 U.S. 438 (1962).

.

SO ORDERED.

Dated: Brooklyn, New York
      August 31, 2012

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge

23